UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IMPACT FINISHING, INC. d/b/a IMPACT STAMPING | § § § | |
| Plaintiff/Counter-Defendant, | § § | |
| v. | § § | CIVIL ACTION NO. 3:22-CV-0290-B |
| WILD CARD, INC. f/k/a WILD CARD, LLC and DANIEL ATKINS D/B/A INNOVENT BRANDS, LLC., | § § § § | |
| Defendants/Counter-Plaintiffs, | § § | |
| v. | § § | |
| GRAPHIC CONVERTING LTD. and ANKIT PARIKH, | § § § | |
| Third-Party Defendants. | § § | |

MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Summary Judgment of Plaintiff and Counter-Defendant Impact Finishing, Inc. d/b/a Impact Stamping ("Impact Stamping") and Third-Party Defendants Graphic Converting Ltd. and Ankit Parikh (collectively "Impact") (Doc. 41). Also before the Court is the Motion for Partial Summary Judgment of Defendants and Counter-Plaintiffs Wild Card, Inc. f/k/a Wild Card, LLC ("Wild Card, Inc.") and Daniel Atkins d/b/a Innovent Brands, LLC (collectively "Wild Card") (Doc. 45). For the reasons that follow, the Court **GRANTS** in part and **DENIES** in part the relief requested.

# I.

# BACKGROUND

While there are a myriad of claims asserted in this case, at bottom this lawsuit is about a contract between Impact and Wild Card. Wild Card is in the sports trading card business. Doc. 47-1, Defs.' App'x, 371. Impact is in the printing business. Doc. 42-1, Parikh Aff., ¶ 3. In substance, Impact promised to produce trading cards for Wild Card, and Wild Card promised to pay Impact for those goods. Impact claims that it produced and delivered quality trading cards to Wild Card and that Wild Card breached the contract by failing to pay for the cards. Wild Card's position is that Impact breached the contract by failing to produce quality cards, and therefore Wild Card was under no obligation to pay.

## A.   *Factual Background*

In May 2021, Wild Card's CEO,[1] Daniel Atkins, sought the services of a manufacturer to produce trading cards for Wild Card's upcoming Blaster Project. 47-1, Defs.' App'x, 395–96, 1003. The production of trading cards includes the process of printing, laminating, collating, cutting, and packaging the cards. *Id.* at 70–71. The Blaster Project specifically called for the production of roughly 8.1 million trading cards in order to fulfill purchase orders placed by two distributors, with a target completion date of September 2021. *Id.* at 1003; Doc. 42-1, Parikh Aff., ¶ 5. Atkins eventually identified Graphic Converting Ltd. as a potential printer for the Blaster Project. 47-1, Defs.' App'x, 1003. Atkins believed that Graphic Converting Ltd. "was related to Graphic Converting Packaging, a known leader in the trading card space." *Id.*  In July 2021, Atkins "contacted Graphic Converting Ltd. . . . [and] spoke to Ankit Parikh, the [president] of Graphic

---

[1] In May 2021, Wild Card was a limited liability company; Wild Card later converted into a corporation. *See* Doc. 42-12.

Converting, Ltd." *Id*. at 1003; *see* Doc. 42-1, Parikh Aff., ¶ 2. Parikh was also the president of Impact Stamping. Doc. 42-1, Parikh Aff., ¶¶ 2.

Thereafter, Atkins and Parikh began negotiating a deal for the Blaster Project. 47-1, Defs.' App'x, 1003.  During this period, Wild Card's representatives visited Impact Stamping's printing facility. Doc. 42-1, Parikh Aff., ¶ 4; 47-1, Defs.' App'x, 81. At one of these early meetings, Atkins was introduced to Randy McClure, a consultant who helped Impact develop a strategy in anticipation of the Blaster Project. *See* Doc. 42-10, McClure Deposition, 4; Doc. 47-1, Defs.' App'x, 74. McClure had previously been a supplier to a different printer, Graphic Converting Packaging, "which produces trading cards for Topps and Panini." Doc. 42-10, McClure Deposition, 4. While Wild Card and Impact continued negotiations, Parikh messaged Atkins "you will be working with guys who make cards for topps, panini and upper deck." 47-1, Defs.' App'x, 15.

On August 4, 2021, Parikh emailed Atkins the final quote; the quote provided for the production of 8.1 million cards at a total price of $544,956.77. Doc. 42-2, Quote, 2. Parikh explained that "[i]f everything looks good [in the quote], either provide a PO# or respond to this email confirming we are good to proceed with this order." *Id*. In that same email, Parikh also sent Atkins a Confidential Credit Application and Acknowledgement of Terms ("CCA"), which Atkins was instructed to complete "so [Parikh] could get everything set up." *Id*.; Doc. 47-1. Defs.' App'x, 22–23; Doc. 42-1, Parikh Aff., ¶ 5. The un-signed CCA stated that "[t]his Confidential Credit Application is entered into by Impact Stamping and . . . Applicant." *See* Doc. 47-1. Defs.' App'x, 22. The following day, August 5, Atkins signed the CCA and listed two entities as the Applicants: "Wild Card, Inc." and "Innovent Brands [d/b/a] Wild Card." *Id*. at 22–23. The language of the CCA only states that Wild Card will pay invoices on goods delivered by Impact within 45 days and

that, in the event Impact was "required to retain an attorney to collect on any overdue invoice, [Impact] shall be entitled to receive all attorney fees." *Id.* at 23.

After the CCA was signed, Impact agreed to produce an additional one million cards for the Blaster Project at Wild Card's request, bringing the total number of cards Impact needed to produce for the Blaster Project to approximately 9.1 million. Doc. 47-1, Defs.' App'x, 446; Doc. 42-1, Parikh Aff., ¶ 10. Although it is not entirely clear, the parties seem to agree that this modification to Impact's obligation is encompassed by the CCA. *See* Doc. 47-1. Defs.' App'x, 446, 1003–04; Doc. 42-1, Parikh Aff., ¶ 10.

Wild Card later asked Impact to complete two additional projects, Megabox and Industry Summit. Doc. 47-1, Defs.' App'x, 441–45. The Megabox project was initially awarded to another printer, but after problems arose, Wild Card turned to Impact complete the project. *Id.* at 1004. It is unclear how many cards Impact needed to produce to complete the Megabox project. The Industry Summit project called for the production of approximately 5,000 cards "that sparkle and dance and shimmer" for an industry conference. *Id.* at 444–45. Impact agreed to complete the Megabox project and to produce the 5,000 cards for the Industry Summit project. *Id.* at 1004; Doc. 42-1, Parikh Aff., ¶¶ 8–9. These projects were also apparently encompassed by the initial CCA. *See* Doc. 47-1. Defs.' App'x, 1003–04; Doc. 42-1, Parikh Aff., ¶¶ 8–9. Although the parties agreed that Wild Card would pay Impact for the Megabox Project and Industry Summit Project within 45 days of invoicing, at Impact's request, Wild Card paid $250,000 before any cards had been delivered. Doc. 47-1, Defs.' App'x, 131–32, 1004. Impact completed these two additional projects without objection by Wild Card. *Id.* at 443–46.

In the meantime, Impact continued its work on the Blaster Project. Impact ultimately completed the Blaster Project and delivered the approximately 9.1 million cards to Wild Card (or directly to one of Wild Card's distributors) in October 2021.[2] Doc. 47-1, Defs.' App'x, 459; Doc. 42-1, Parikh Aff., ¶¶ 15–16. After Impact's delivery, however, Wild Card discovered that some of the cards were defective. Doc. 47-1, Defs.' App'x, 1004. Specifically, there were issues with "color saturation, scratches, cutting mistakes, and correlation." *Id.* Atkins claims that he informed Impact of these issues "as soon as [he] became aware of [them]," and on October 23, 2021, Wild Card rejected approximately 460,000 cards to Impact due to these defects. *Id.* at 1004–05; Doc. 42-1, Parikh Aff., ¶ 16. Wild Card returned these 460,000 cards to Impact on October 25, 2021. Doc. 42-1, Parikh Aff., ¶ 16; Doc. 47-1, Defs.' App'x, 459–60.  Although Wild Card claims that there were problems with the approximately 8.6 million other cards that were not returned to Impact, these 8.6 million cards were sold by Wild Card for a profit. Doc. 47-1, Defs.' App'x, 483–87.

Impact informed Wild Card that Impact would replace the 460,000 cards that had been rejected and returned to it. *See* Doc. 42-1, Parikh Aff., ¶ 16. Then, on October 28, Atkins asked Parikh for an update on the replacements and stated, "We are now officially late [for] wal-mart." Doc. 56-2. Defs.' Resp. App'x, 2. Parikh responded that Impact was still attempting to replace the 460,000 cards. *Id.* Parikh also explained that one of his subcontractors was in possession of the extra cards that could be used to replace the 460,000 defective cards, but that he was still trying to get in contact with the subcontractor. *Id.*; *see* Doc. 42-1, Parikh Aff., ¶ 16. Then, on November 9, Parikh emailed the subcontractor, asking when he could arrange for a pick-up of the replacement card. Doc. 42-9, Ex. A-8, 1; *see* Doc. 42-1, Parikh Aff., ¶ 16.  Parikh did not follow up with Atkins

---

[2] It is unclear when exactly in October 2021 the cards were delivered.

until November 19, 2021, at which time Parikh stated that Impact had not yet obtained replacements. *See* Doc. 56-3. Defs.' Resp. App'x, 2. The same day, Atkins informed Parikh that because the "packs were sent back to you a month or so ago" and because "we were/are already later [in] delivering this product," Wild Card was forced hired another printer to replace the 460,000 cards. *Id.* The other printer ultimately reproduced the 460,000 cards in satisfaction on the Blaster Project for approximately $320,000. Doc. 47-1, Defs.' App'x, 34–37.

After the Blaster Project was completed, Impact invoiced Wild Card for that project as well as for costs incurred with other, unrelated projects. *See* Doc. 42-1, Parikh Aff., ¶¶ 18–20. Wild Card, however, refused to pay a portion of these invoices because of issues with the Blaster Project. Doc. 47-1, Defs.' App'x, 553–58. To date, Wild Card has not fully paid Impact for the Blaster Card project or its related costs, nor has Wild Card fully paid Impact for its work on other projects that Impact was asked to complete. *Id.* Wild Card has withheld payment to Impact on invoices totaling $641,636.59. Doc. 42-1, Parikh Aff, ¶ 20.

B.     *Procedural Background*

Impact Stamping filed the present suit against Wild Card, Inc. and Atkins on February 8, 2022. Doc. 2, Compl. Impact brought claims for suit on open account, breach of contract, and attorneys' fees. *Id.* ¶¶ 30–32. Wild Card answered on May 10, 2022, raising several affirmative defenses to Impact Stamping's breach of contract claim. Doc. 14, Answer & Countercl., 5–8. Wild Card also asserted the following counterclaims against Impact Stamping and third-party claims against Graphic Converting Ltd.: breach of contract, breach of express warranty, and breach of the implied warranties of merchantability, fitness for a particular purpose, and good workmanship. *Id.*

at 13–18. *Id*. at 13–17. Finally, Wild Card brought a fraud claim against Parikh individually. *Id*. at 18–19.

Impact and Wild Card have since filed cross-motions for summary judgment. Doc. 41, Pls.' Mot. Summ. J.; Doc. 45, Defs.' Mot. Summ. J. Both sides have affirmatively and cross moved for summary judgment on their respective breach of contract claims; Wild Card's affirmative defenses to Impact Stamping's contract claim; and Wild Card's claims for breach of the express and implied warranties. Doc. 42, Pls.' Mot. Summ. J. Br.; Doc. 45, Defs.' Mot. Summ. J., 1–2 Further, Impact Stamping has moved for summary judgment on its contract claim against Atkins individually and on each of Wild Card's claims against Graphic Converting Ltd. Doc. 41, Pls.' Mot. Summ. J. Br., 1–2. Lastly, Wild Card has moved for summary judgment on Impact Finishing's claim for suit on open account and on its own fraud claim against Parikh.[3] Doc. 45, Defs.' Mot. Summ. J., 1–2. These motions are now ripe for review.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). On a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991

---

[3] Wild Card also moved for summary judgment on Impact Stamping's claim to attorneys' fees. Doc. 45, Defs.' Mot. Summ. J. However, the Court cannot rule on this aspect of Wild Card's motion until it resolves Impact Stamping's pending motion for leave to amend. *See* Doc. 49, Mot. Thus, the Court defers ruling on Wild Card's summary-judgment on the claim attorneys' fees to a later date.

(5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. SmithKline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A non-moving party with the burden of proof must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim," *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004), and "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED R. CIV. P. 56(e)).

## III.

## ANALYSIS

After considering the parties' respective motions for summary judgment, the Court concludes that both Impact[4] and Wild Card are entitled to partial summary judgment.

A.    *Suit on Open Account*

Impact initially asserted a claim for suit on open account; however, in response to Wild Card's motion for summary judgment, Impact waived this claim. Doc. 58, Pls.' Resp, ¶ 8. Thus, to the extent a ruling is necessary to dispose of a waived claim, Wild Card's motion for summary judgment is **GRANTED** as to Impact's claim for suit on open account.

B.    *Breach of Contract*

Impact and Wild Card have each asserted claims for breach of contract against one another. Doc. 2, Compl., ¶¶ 31–32; Doc. 14, Answer & Countercls., ¶¶ 46–50. Impact claims that Wild Card breached by failing to pay for the cards produced and delivered by Impact; Wild Card claims that Impact breached by failing to produce quality cards. Doc. 2, Compl., ¶ 31; Doc. 14, Answer & Countercls., ¶ 49. Impact and Wild Card have each moved for summary judgment on its respective breach of contract claim and cross-moved for summary judgment on the opposing side's breach of contract claim. Doc. 42, Pls.' Mot. Summ. J. Br., ¶¶ 26–41; Doc. 46, Defs.' Mot. Summ. J. Br., 5–12. Impact and Wild Card have also filed cross-motions for summary judgment on Wild Card's affirmative defenses to Impact's breach of contract claim. *See* Doc. 41, Pls.' Mot. Summ. J.; Doc. 45, Defs.' Mot. Summ. J.

---

[4] In this Section, the Court will refer to Impact Stamping, Graphic Converting Ltd., and Ankit Parikh as a single party, "Impact," for clarity, even though certain claims and defenses may not be applicable to all three parties. The Court will use a party's full name (or, if applicable, as shortened) when the Court is referring to a party individually.

The Court's analysis of the parties' breach of contract claims and related defenses proceeds in three parts. First, the Court examines whether Impact and Wild Card have proven each element of their contract claims as a matter of law. Ultimately, the Court concludes that Impact and Wild Card have done so; however, neither Impact nor Wild Card have adequately proven their claimed damages. The Court thus grants in part Impact and Wild Card's motions for summary judgment on their respective contract claims with respect to the issue of liability but leaves the issue of damages on those claims for trial. Second, the Court analyzes which parties, specifically, may be held liable for breach. In this regard, the Court concludes that Graphic Converting Ltd. was not a party to the contract and consequently may not be held liable for breach of contract or any claims derivative thereof. However, fact issues preclude a finding that Atkins is personally liable for breach at this stage. Third, and finally, the Court considers the parties' cross-motions for summary judgment on Wild Card's affirmative defenses to Impact's breach of contract claim and concludes that Impact is entitled to summary judgment on all but two defenses.

1.   Essential Elements

Impact and Wild Card have each moved for summary judgment on their respective contract claims. Where, as here, the "movant[s] bear[] the burden of proof on an issue . . . [they] must establish beyond peradventure *all* of the essential elements of the claim . . . to warrant judgment in [their] favor." *Fontenot*, 780 F.2d at 1194. "Under Texas law, '[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Roberts v. Overby-Seawell Co.*, No. 3:15-CV-1217-L, 2018 WL 1457306, at *7 (N.D. Tex. Mar. 23, 2018) (Lindsay, J.) (alteration in original)

(quoting *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009)). Therefore, to be entitled to summary judgment, Impact and Wild Card must each come forward with evidence establishing that there is no genuine dispute of fact pertaining to these elements and that it is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 323; *Fontenot*, 780 F.2d at 1194.

Moreover, because the parties agree that the alleged contract at issue in this case involves the sale of goods, Doc. 42, Pls.' Mot. Summ. J. Br., ¶ 35; Doc. Doc. 46, Defs.' Mot. Summ. J. Br., 2, the Texas version of Article Two of the Uniform Commercial Code ("UCC") governs. TEX. BUS. & COM. CODE ANN. § 2.102. "Where the Texas UCC applies, 'it displaces all common law rules of law regarding breach of contract and substitutes instead those rules of law and procedure set forth in the [UCC].'" *Advon Corp. v. Coopwood's Air Conditioning Inc.*, 517 F. Supp. 3d 656, 663 (S.D. Tex. 2021) (quoting *Glenn Thurman, Inc. v. Moore Constr., Inc.*, 942 S.W.2d 768, 771 (Tex. App.—Tyler 1997, no writ). However, the UCC only applies when it "is both applicable to a claim in general and addresses that claim in a manner inconsistent with the common law." *Prosper Fla., Inc. v. Spicy World of USA, Inc.*, 649 S.W.3d 661, 676 (Tex. App.—Houston [1st Dist.] 2022, no pet.). Accordingly, "common-law principles complement the UCC to the extent they do not conflict with the UCC and supplement its provisions unless displaced by particular provisions of the UCC." *Id.* at 677.

Here, Impact and Wild Card have each proven the elements of their respective breach of contract claims as a matter of law. *See Fontenot*, 780 F.2d at 1194; *Roberts*, 2018 WL 1457306, at *7.

i.  *Valid Contract*

First, there is no genuine dispute that there was valid a contract between Impact and Wild Card. "The UCC provides that 'a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.'" *Crest Ridge Const. Grp., Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996) (quoting Tex. Bus. & Com. Code Ann. § 2.204(a)).

Here, the parties agree,[5] and the evidence establishes, that Impact and Wild Card entered into a valid contract for the delivery of trading cards. *See* Doc. 42, Pls.' Mot. Summ. J. Br., ¶ 27; Doc. 46, Defs.' Mot. Summ. J. Br., 2, 11–12. On August 4, 2021, Parikh emailed Atkins a quote for the production of 8,122,580 cards at a price $544,956.77. Doc. 42-2, Quote, 3. In the same email, Parikh explained that "[i]f everything looks good [in the quote] . . . respond to this email confirming we are good to proceed with this order." *Id.* at 2. In conjunction with this request, Parikh also asked Atkins to fill out the CCA "so [Parikh] can get everything setup." *Id.* The following day, Atkins completed and signed the CCA. Doc. 42-4, CCA, 2–3. After the CCA was signed, Impact produced and delivered cards to Wild Card, and Wild Card paid for a portion of those cards. *See* Doc. 47-1, Defs.' App'x, 131–32, 400, 1004.

The Court construes the quote sent by Parikh as an offer made by Impact and the signed CCA as an acceptance from Wild Card. *See J.D. Fields & Co. v. U.S. Steel Int'l, Inc.*, 426 F. App'x 271, 276 (5th Cir. 2011); Tex. Bus. & Com. Code Ann. § 2.204(a). Although a quote is generally considered an invitation for an offer, rather than an offer in and of itself, a "price quotation, if

---

[5] In its Answer, Wild Card initially asserted unenforceability as an affirmative defense; however, Wild Card has since admitted otherwise. Doc. 47-1, Defs.' App'x, 396–97, 416, 460, 475, 559; Tex. Bus. & Com. Code Ann. § 2.201(c)(2).

detailed enough, can constitute an offer capable of acceptance." *See J.D. Fields & Co.*, 426 F. App'x at 276. "However, to do so, it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." *Id.* (citations omitted). In this case, the offer included a quantity term, a price point, and specified payment term. Doc. 42-2, Quote; Doc. 42-4, CCA, 2–3; *see J.D. Fields & Co.*, 426 F. App'x at 276.  In addition, the email in which the quote was sent expressly stated that "[i]f everything looks good [in the quote] . . . respond to this email confirming we are good to proceed with this order." Doc. 42-2, Quote, 2. Under these facts, the quote constituted an offer because it "reasonably appear[s] from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." *See J.D. Fields & Co.*, 426 F. App'x at 276. Further, Wild Card's conduct in signing the CCA the following day and returning it to Impact was sufficient to constitute an acceptance of Impact's offer, as it evidences an intent to be bound by the terms of the quote. *See* Doc. 42-2, Quote, 2 ("If everything looks good [in the quote] . . . respond to this email confirming we are good to proceed with this order."); *see also* TEX. BUS. & COM. CODE ANN. § 2.206(a)(1) ("[A]n offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."). And the parties' conduct after the CCA was signed—namely Impact's production of the cards and Wild Card's partial payment—further suggests the existence of a valid contract. *See* TEX. BUS. & COM. CODE ANN. § 2.204(a); Doc. 47-1, Defs.' App'x, 131–32, 400, 1004.

Because there is no genuine dispute that there was an offer and acceptance, and because the parties acted in a manner consistent with the existence of a contractual relationship, the Court concludes that a valid contract existed between Impact and Wild Card. *See* TEX. BUS. & COM. CODE ANN. § 2.204(a). That contract required Impact to produce approximately 8.1 million cards

and Wild Card to pay approximately $550,000 for those cards (and related services) with payment due 45 days after invoicing.

The evidence also demonstrates that Wild Card and Impact validly modified the contract. *See, e.g.*, Doc. 47-1, Def's App'x, 446; Doc. 42-1, Parikh Aff., ¶¶ 7–10. After the CCA was signed and at Wild Card's request, Impact agreed to produce one million additional cards for the Blaster Project (bringing the total to 9.1 million cards) and to complete two other projects, Megabox and Industry Summit; in return, Wild Card agreed to pay Impact for these cards and the related costs within 45 days of invoicing in accordance with the CCA. Doc. 47-1, Def's App'x, 446, 1004; Doc. 42-1, Parikh Aff., ¶¶ 7–10; Doc. 42-4, CCA. Although the evidence does not clearly disclose the contracted for price of these additional cards, this does not preclude a finding of a valid contract modification. *See* TEX. BUS. & COM. CODE ANN. § 2.305 ("The parties if they so intend can conclude a contract for sale even though the price is not settled."); *see also id.* § 2.204(a)–(c). Accordingly, the Court concludes that Impact and Wild Card validly modified their contract to increase the number of cards Impact was obligated to produce and to require that Wild Card pay for these additional cards and services in the same manner provided in the CCA. Because the Court concludes that the contract is valid (both initially and as modified), Wild Card and Impact have established the first element of their breach of contract claims as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

ii.     *Performance*

Second, Impact and Wild Card have each established beyond peradventure that they performed under the contract. *See Fontenot*, 780 F.2d at 1194; *Roberts*, 2018 WL 1457306, at *7. "Under the [UCC], 'the obligation of the seller is to transfer and deliver and that of the buyer is to

accept and pay in accordance with the contract.'" *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 352 (Tex. App.—Houston [1st Dist.] 2001, not pet.) (quoting Tex. Bus. & Com. Code Ann. § 2.301).

As applied here, it is undisputed that the contract required Impact to deliver trading cards and Wild Card to pay for those cards within 45 days of invoicing. Doc. 42-1, Parikh Aff., ¶ 5; Doc. 47-1, Defs.' App'x, 22–23, 1004. It is further undisputed that Impact in fact delivered approximately 9.1 million trading cards to Wild Card and that, upon Impact's request, Wild Card prepaid $250,000 for some of those cards. Doc. 47-1, Defs.' App'x, 131–32, 400, 1004; Doc. 42-1, Parikh Aff., ¶¶ 10, 16. Although Impact and Wild Card each claim that the other did not *fully* perform under contract, these arguments are better addressed under the third element—whether there was a breach of the contract. *Cf. Glenn Thurman, Inc.*, 942 S.W.2d at 772 ("[T]he common law doctrine that one contracting party is automatically excused from his contractual performance by the prior breach of the other party is wholly inapplicable to a contract for the sale of goods governed by the [UCC]."). Thus, for purposes of maintaining their respective breach of contract claims, Impact and Wild Card have established as a matter of law that they performed.

      *iii.*    *Breach*

Third, each party breached the contract. Under the UCC "if the goods or the tender of delivery fail in any respect to conform to the contract," a buyer has three options: accept the entire delivery, reject the entire delivery, or reject the nonconforming goods and accept the rest. Tex. Bus. & Com. Code Ann. § 2.601. If a seller delivers nonconforming goods, then a buyer may reject those goods; where a buyer properly rejects, the buyer is under no obligation to pay for those goods, and the seller is generally in breach. *See Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d

301, 310 (Tex. App.—Dallas 2006, no pet.) ("A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach of contract remedies for delivery of non-conforming goods."); *Equistar Chemicals, LP v. ClydeUnion DB, Ltd.*, 579 S.W.3d 505, 517 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). However, if the buyer accepts any of the goods delivered by the seller—even nonconforming goods—the buyer is obligated to pay the contract rate for the goods thus accepted, unless the buyer effectively revokes his acceptance. TEX. BUS. & COM. CODE ANN. §§ 2.607–.608; *see also Coim USA Inc. v. Sjobrand Inc.*, No. 3:21-CV-02736-E, 2023 WL 2589240, at *3 (N.D. Tex. Mar. 21, 2023) (Brown, J.). A buyer's failure to pay when under an obligation to do so (i.e., after goods are finally accepted) is a beach of the contract. *See* TEX. BUS. & COM. CODE ANN. § 2.601(a); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 840–41 (S.D. Tex. 2013) ("A seller may sue for the price of the goods when the buyer failed to pay as that bill became due.").

Here, the evidence establishes that Impact and Wild Card each breached the contract as a matter of law. As explained more fully below, Wild Card breached the contract because it accepted, but did not pay for, a portion of the goods; Impact breached the contract by delivering nonconforming goods that Wild Card properly rejected or revoked.

### a.   Wild Card breached with respect to the 8.6 million cards it accepted

Wild Card breached the contract as a matter of law because there is no genuine dispute that it accepted, but did not pay for, approximately 8.6 million cards delivered by Impact.

As applicable to this case, acceptance of goods occurs when the buyer "does any act inconsistent with the seller's ownership" TEX. BUS. & COM. CODE ANN. § 2.606(a). "Generally, . . . a buyer who exercises dominion and control over nonconforming goods accepts those goods."

*Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 772 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m). Once there is an effective acceptance, a buyer is precluded from rejecting those goods. TEX. BUS. & COM. CODE ANN. § 2.607. While a buyer may still revoke his acceptance if it "was reasonably induced . . . by the difficulty of discovery [of the non-conformity]," *id.* § 2.608, a buyer's "sale of the goods, is inconsistent with a claim by the buyer that acceptance has been revoked." *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 735 F.2d 177, 181 (5th Cir. 1984) (applying the same provision of the Kansas version of the UCC).

Here, the Court concludes that Wild Card accepted all but 460,000 cards delivered by Impact when Wild Card sold those cards and retained the profits. It is not disputed that Impact delivered approximately 9.1 million cards pursuant to the contract. Doc. 47-1, Defs.' App'x, 133, 485–87, 1004; Doc. 42-1, Parikh Aff., ¶¶ 10, 16. It is further undisputed that Wild Card only returned 460,000 cards, while the remaining 8.6 million were sold by Wild Card to various retailers for a profit. Doc. 42-1, Parikh Aff, ¶ 18; Doc. 47-1, Defs.' App'x, 483–387. Because there is no genuine dispute that Wild Card retained, sold, and profited from approximately 8.6 million cards delivered by Impact, the Court concludes that Wild Card acted in a manner "inconsistent with . . . [Impact's] ownership" over these cards, and thus accepted them. TEX. BUS. & COM. CODE ANN. § 2.606(a)(3).

Although Wild Card claims that it rejected the 8.6 million cards as soon as it was reasonable, Doc. 55, Defs.' Resp., 6, acceptance by an act "inconsistent with the seller's ownership" may occur even though a buyer does not have a reasonable opportunity to inspect the goods. *Compare* TEX. BUS. & COM. CODE ANN. § 2.606(a)(1) (acceptance occurs if the buyer "after a reasonable opportunity to inspect the goods" signifies he will take the goods), *and id.* § 2.606(a)(2)

(acceptance occurs if the buyer fails to reject if buyer "had a reasonable opportunity to inspect [the goods]"), *with id.* § 2.606(a)(3) (acceptance occurs where buyer "does any act inconsistent with the seller's ownership"). Therefore, that Wild Card attempted to reject the cards "as soon as it was reasonable," Doc. 55, Defs.' Resp., 6., is immaterial because Wild Card had already accepted the cards prior to any attempted rejection by acting in a manner inconsistent with Impact's ownership of the cards; any attempt to reject the cards by Wild Card after it acted in a manner inconsistent with Impact's ownership would be ineffective because once there has been an acceptance, a buyer loses the right to reject. *See* TEX. BUS. & COM. CODE ANN. § 2.607(b).

Because Wild Card accepted approximately 8.6 million cards, it was obligated to pay for those cards unless it validly revoked its acceptance. *See* TEX. BUS. & COM. CODE ANN. § 2.601(a). As pertinent to this case, buyer may revoke his acceptance if the acceptance was originally induced by the difficulty in discovering the nonconformity and if the revocation occurs before a substantial change in the condition of the goods. *Id.* § 2.608. Here, while Wild Card claims that it could not have reasonably discovered the defects in the cards prior to the sale, it continued to sell these allegedly defective cards and retained the profits therefrom even after Wild Card supposedly discovered the defects; Wild Card did not take any steps to recall these cards so that they may be returned to Impact after the defects were uncovered. *See* Doc. 47-1, Defs.' App'x, 461, 483–387. Such conduct "is inconsistent with a claim by . . . [Wild Card] that acceptance has been revoked." *See Delhomme Indus.*, 735 F.2d at 181. Thus, the Court concludes that, as a matter of law, Wild Card did not revoke its acceptance.

Having finally accepted approximately 8.6 million cards, Wild Card was under an obligation to pay for these cards. *See Coim USA Inc.*, 2023 WL 2589240, at *3. Wild Card admitted that it

has not paid the full price for the 8.6 million cards it accepted. Doc. 47-1, Defs.' App'x, 558. As such, Wild Card is in breach.

Wild Card nevertheless argues that it did not breach the contract because Impact's performance was a condition precedent to its obligation to perform. Doc. 46, Defs.' Mot. Summ. J Br., 5–8. According to Wild Card, Impact breached the contract by delivering at least 460,000 defective trading cards, and as result, Wild Card's duty to perform under the contract never became due—and if Wild Card's duty to perform never became due, it could not be in breach. *Id.* at 7–8. But this is not the rule under the UCC: "[T]he doctrine that one contracting party is automatically excused from his contractual performance by a prior breach of the other party is wholly inapplicable to a contract for the sale of goods governed by the [UCC]." *Omni USA, Inc.,* 964 F. Supp. 2d at 841 (citation omitted). Thus, any alleged breach by Impact would not have excused Wild Card's duty of counter performance with respect to the goods it accepted.

Because there is no genuine dispute that Wild Card accepted (and did not revoke it acceptance as to) all but 460,000 cards, Wild Card was under an obligation to pay for those goods. There is no genuine dispute that Wild Card did not pay for the goods it accepted, even though it was under an obligation to do so. Impact has thus established the third element of its contract claim as a matter of law.

> b.     Impact breached with respect to the 460,000 cards that were returned

Notwithstanding Wild Card's breach, the Court further concludes that Impact likewise breached the contract with respect to the 460,000 cards that were returned to it.[6] Impact delivered

---

[6] Impact seeks to clarify that only 46,000 cards of the 460,000 returned cards were defective. However, the 460,000 cards were contained in 46,000 packs of cards, and each pack contained ten cards.

460,000 nonconforming cards; Wild Card either rightly rejected or revoked its acceptance as to these cards. And Impact either did not have an opportunity to cure, or if it did, failed to timely cure its nonconforming deliver. As such, Impact breached.

A buyer has a right to reject or revoke its acceptance as to any commercial unit which is nonconforming, [7] TEX. BUS. & COM. CODE ANN. §§ 2.601, 2.608, and a valid rejection or revocation generally renders the seller in breach. *See id.* § 2.711. Under limited circumstances, however, the UCC allows a seller an opportunity to cure a nonconforming delivery—and if the seller cures in a manner prescribed by the UCC, then the seller generally may not be held liable for breach stemming from its prior nonconforming delivery. *See id.* § 2.508(a); *see also id.* § 2.711 editor's note ("Despite the seller's breach, proper retender of delivery under the section on cure of improper tender or replacement can effectively preclude the buyer's remedies under this section, except for any delay involved.").

Here, it is undisputed that 460,000 cards delivered by Impact were nonconforming, and thus Wild Card had the right to reject or revoke its acceptance as to those cards. *See* Doc. 42, Pls.' Mot. Summ. J. Br., ¶¶ 40–41; Doc. 62, Pls.' Reply Br., ¶ 3. Further, Impact does not appear to dispute that Wild Card in fact either validly rejected or revoked its acceptance when it returned the 460,000 cards to Impact. *See* Doc. 42, Pls.' Mot. Summ. J. Br., ¶ 40; Doc. 62, Pls.' Reply Br., ¶ 3. As such, Impact was in breach unless (1) it had an opportunity to cure its defective delivery and

---

In this case, only one card in each pack of ten was nonconforming. Nevertheless, here, the commercial unit was each pack of ten cards, not the single card within each pack. Thus, if one card in the pack is defective, the entire commercial unit is defective. *Cf.* TEX. BUS. & COM. CODE ANN. §§ 2.606(b).

[7] There are further restrictions on a buyer's right to revoke his acceptance beyond the existence of non-conforming goods. *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 2.608(a)(2) (revocation permissible where "acceptance was reasonably induced . . . by the difficulty of discovery [of the nonconformity] before acceptance.").

(2) in fact did cure its defective delivery properly under the UCC. *See Gappelberg v. Landrum*, 666 S.W.2d 88, 91 (Tex. 1984); *Tex. Imports v. Allday*, 649 S.W.2d 730, 738 (Tex. App.—Tyler 1983, writ ref'd n.r.e.); *see also* TEX. BUS. & COM. CODE ANN. § 2.711.

Under the UCC, an opportunity to cures exists where a seller's delivery "is *rejected* because non-conforming [if] the time for [the seller's] performance has not yet expired." TEX. BUS. & COM. CODE ANN. § 2.508(a) (emphasis added). However, no right to cure exists where a buyer revokes his initial acceptance of a delivery. *See Gappelberg*, 666 S.W.2d at 91. If a seller's delivery is rejected before the seller's performance is due under the contract, then then the seller may properly cure by first "seasonably notify[ing] the buyer of his intention to cure" and then delivering conforming goods "within the contract time [to] make a conforming delivery." TEX. BUS. & COM. CODE ANN. § 2.508(a). If the seller fails to timely cure (i.e., cure before the time for the seller's performance under the contract is due), then the seller is in breach. *See Tex. Imports*, 649 S.W.2d at 738; *see also* TEX. BUS. & COM. CODE ANN. § 2.711.

Here, while Impact claims it had a right to cure its nonconforming delivery, its position on whether Wild Card accepted or revoked its acceptance of the 460,000 cards is inconsistent. In its briefing, Impact states that when Wild Card returned the 460,000 cards to Impact, Wild Card "rejected only [460,000 cards] . . . produced by Impact." Doc. 42, Pls.' Mot. Summ J. Br., ¶ 40. In other parts of its briefing, however, Impact maintains that Wild Card "revoked [its] acceptance as to [those same cards]." Doc. 62, Pls.' Reply Br., ¶ 3. Although Impact uses the terms rejection and revocation interchangeably, the distinction between these two concepts is crucial because only the former gives rise to an opportunity to cure. *See Gappelberg*, 666 S.W.2d at 91 ("Thus, we state that

once a buyer has properly revoked acceptance of a product, the seller has neither the right to cure by repair nor by replacement.").

Notwithstanding Impact's inconsistent position, the undisputed facts presented here establish that Impact breached the contract as a matter of law regardless of whether Wild Card's return of the 460,000 cards constituted a rejection or revocation. If the Court accepts Impact's position that Wild Card "revoked [its] acceptance," Doc. 62, Pls.' Reply Br., ¶ 3, then no right to cure existed, and Impact was in breach. *See Gappelberg*, 666 S.W.2d at 91. If, on the other hand, the Court accepts Impact's claim that Wild Card rejected the cards, Doc. 42, Pls.' Mot. Summ J. Br., ¶ 40, Impact still breached the contract because it did not timely cure its defective delivery. *See* TEX. BUS. & COM. CODE ANN. § 2.508(a) (seller must cure by making a conforming deliver "within the contract time.").

As discussed, in order to properly cure a nonconforming delivery under the UCC, a seller must deliver conforming goods before the seller's performance under the contract is due. *See* TEX. BUS. & COM. CODE. ANN. § 2.508(a). Here, there is uncontradicted evidence that by October 28, 2021, Wild Card was officially late in fulfilling the purchase order for these 460,000 cards. Doc. 56-2, Ex. 1, 2. Given that Impact was hired to fulfill that purchase order, *see* Doc. 47-1, Defs.' App'x, 314–15, 1003; Doc. 42-1, Parikh Aff., ¶3, there is no genuine dispute that the time for Impact's performance under the contract was—at the latest—October 28, 2021, and therefore, any opportunity to cure would have ended on that date. *See* TEX. BUS. & COM. CODE. ANN. § 2.309 editor's note (explaining that when time for performance is unspecified in the contract, performance is due within a reasonable time "in view of the nature, purpose and circumstances of the action to be taken"); *see also id.* § 2.508. Impact did not cure its nonconforming delivery before

October 28, even though Wild Card returned the 460,000 defective cards on October 25. Doc. 42-1, Parikh Aff., ¶ 16. While Impact argues that Wild Card prevented its attempt to cure,[8] Impact points to no evidence supporting such a claim between the time the cards were returned to Impact and the time Impact's performance was due. Accordingly, Impact breached by failing to cure its defective delivery before its performance was due under the contract. *See Texas Imports*, 649 S.W.2d at 738; TEX. BUS. & COM. CODE ANN. § 2.711.

In sum, there is no genuine dispute that Wild Card either rejected or revoked its acceptance of 460,000 cards delivered by Impact. The parties agree these cards were nonconforming goods, and thus Wild Card was within its rights to either reject the delivery or revoke its acceptance of the delivery. Impact either had no right to cure or, if it did, failed to cure its defective delivery before the time for its performance was due. As such, there is no genuine dispute that Impact breached the contract with respect to these 460,000 cards. Wild Card, therefore, has established the third element of its contract claim as a matter of law.

### iv.    Damages

Fourth, and finally, there is no genuine dispute that Impact and Wild Card were each damaged as a result of the other's breach. Although there is some dispute as to extent of damages sustained, there is no genuine dispute that Impact and Wild Card each incurred at least some damages. However, neither Impact nor Wild Card's damages calculations are sufficiently clear to warrant judgment on the value of the contract claims.

---

[8] Impact also argues that, after the cards were returned, Wild Card improperly repudiated the contract without demanding that Impact make assurances that it could cure the defective delivery on November 19, 2021—the date on which Wild Card informed Impact that it had hired another printer to replace the 460,000 defective cards. Doc. 42, Pls.' Mot. Summ J. Br., ¶¶ 34–41. Because the Court concludes that there was no opportunity to cure in this case, or, alternatively, that Impact failed to timely cure before any supposed repudiation, the Court need not address Impact's adequate assurances arguments.

a.     Impact's damages

There is no genuine dispute that Impact was damaged as a result of Wild Card's breach. Wild Card was obligated to pay the contract rate for the approximately 8.6 million cards it accepted. While Wild Card paid Impact $250,000 in advance, there is no dispute that this payment fell short of what Impact was owed under the contract. Doc. 47-1, Defs.' App'x, 557. Impact was damaged by Wild Card's breach because it was not fully compensated for the work under the contract. *See* TEX. BUS. & COM. CODE ANN. § 2.709(a). As such, Impact has proven the fourth and final element of its contract claim against Wild Card as a matter of law. Having proved each element of its contract claim as a matter of law, Impact entitled to summary judgment on its breach of contract claim against Wild Card on the issue of liability. *See* FED. R. CIV. P. 56(g).

However, Impact has not proven the precise number of damages it sustained. For example. as proof of its damages, Impact has only provided the Court with Wild Card's unpaid invoices, Doc. 42-5, Ex. A-4, but these invoices include the cards the 460,000 cards that were Wild Card rightfully rejected (or revoked its acceptance of). *See id.* at 10. Impact does not provide the Court with damages calculations limited those cards finally accepted by Wild Card. As such, a jury must decide the precise amount of damages Impact sustained as a result of Wild Card's breach. *See* FED. R. CIV. P. 56(g).

In sum, Impact has carried its burden of establishing beyond all peradventure the elements of its breach of contract claim against Wild Card with respect to the 8.6 million cards Wild Card accepted. Thus, the Court **GRANTS** Impact's motion for summary judgment its contract claim against Wild Card with respect to the issue of liability. However, Impact has not presented the

Court with proper evidence supporting its damages' figure. Thus, the Court **DENIES** Impact's motion for summary judgment on its contract claim against Wild Card with respect to damages.

b.     Wild Card's damages

Wild Card has also proved the fourth element of its contract claim as a matter of law—that it was damaged as a result of Impact's breach. It is undisputed that at least 460,000 cards delivered by Impact were defective and that Wild Card had to pay another printer to replace these cards. Doc. 47-1, Defs.' App'x, 144–148, 598–611. Wild Card presented evidence that it was damaged as a result of Impact's breach in that Wild Card was forced to hire another printer to replace these defective cards.[9] *See id.* at 34–37. Moreover, there is evidence that Wild Card was damaged by not receiving a timely delivery given that the new printer only delivered the 460,000 replacement cards after the time for Impact's performance had expired. *See id.*; *Missouri-Kansas-Texas R. Co. v. Noble*, 271 S.W.2d 146, 152 (Tex. App.—Fort Worth 1954, writ ref'd n.r.e). As such, Wild Card has likewise proven each element of its contract claim as a matter of law.

However, Wild Card has failed to adequately prove its damages' calculations. The only specific damages' figure provided by Wild Card in its motion for summary judgment is that it paid $323,908 to another printer to replace the defective cards. Doc. 46, Defs.' Mot. Summ. J. Br., 11–12. As evidence of this figure, Wild Card points to invoices the other printer charged Wild Card for the project. Doc. 47-1, Defs.' App'x, 34–37. However, Wild Card is not entitled to recover this

---

[9] Impact has moved to exclude some of Wild Card's evidence of damages, but concedes that, even if such relief was granted, excluding this evidence would not be claim defeating: "While the Damages are clearly important to Wild Card, they are not essential to Wild Card's recovery. Where, as here, excluding a late disclosed damages model will not amount to a de facto dismissal of a party's claims, exclusion of late disclosed damages is appropriate." Doc. 61, Reply, 6; *see also* Doc. 43, Mot. Thus, the Court need not resolve Impact's motion to strike and exclude evidence (Doc. 43) to resolve the present summary-judgment motions.

entire amount—Wild Card's recovery is instead limited to the difference between the "cost of cover" and the original contract price, plus any incidental damages. *See* TEX. BUS. & COM. CODE ANN. § 2.712. The cost of cover is the amount paid to a new seller after the initial breach. *See id.* Thus, Wild Card cannot recover the entire $323,908 from Impact, but only the difference between this figure and the price originally contracted for with Impact (as well as incidental damages). *See id.* Having only provided the cost of cover, the Court cannot calculate cover damages at this stage.

In sum, Wild Card has carried its burden of establishing beyond peradventure each element of its breach of contract claim against Impact. Thus, the Court **GRANTS** Wild Card's motion for summary judgment on its breach of contract claim against Impact with respect to the issue of liability. *See* FED. R. CIV. P. 56(a). However, Wild Card failed to provide the Court with sufficient evidence of its damages' calculations. The Court, therefore, **DENIES** Wild Card's motion on its breach of contract against claim against Impact with respect to the issue of damages. *See id.*

  2. <u>Liability of Graphic Converting Ltd. and Daniel Atkins</u>

While Impact and Wild Card are each entitled to partial summary judgment on their contract claims, there is some dispute as which parties in particular may be held liable for breach (aside from Wild Card, Inc. and Impact Stamping). Impact claims that—in addition to Defendant Wild Card, Inc.—Defendant Atkins, Wild Card's CEO, may be held personally liable on the contract. Doc. 42, Pls.' Summ. J. Mot. Br., ¶¶ 32–33. Wild Card, on the other hand, argues that— in addition to Plaintiff Impact Stamping—Third Party-Defendant Graphic Converting Ltd., one of Impact Stamping's subsidiaries, may be held liable for breach as a party to the contract. Doc. 55, Defs.' Resp, 16–17.

Impact has moved for summary judgment on its contract claim against Atkins individually and on Wild Card's claims against Graphic Converting Ltd. Doc. 42, Pls.' Summ. J. Mot. Br., ¶¶ 32–33, 54–56.  The Court first considers Impact's motion for summary judgment on its claim against Atkins, before turning to Impact's motion on Wild Card's claims against Graphic Converting Ltd.

Impact asserts two theories in its attempt to hold Atkins personally liable. First, Impact argues Atkins is personally liable under the contract as a promoter of an unformed corporate entity. *Id*. ¶ 33.  "[W]here a promoter enters into a contract in the name of a corporation which has not yet been formed, he is personally liable on the contract absent an agreement with the contracting party that the promoter is not liable." *Aloe Ltd., Inc. v. Koch*, 733 S.W.2d 364, 366 (Tex. App.— Corpus Christi-Edinburg 1987, no writ). Impact argues that one of the entities listed as an applicant on the CCA, Wild Card, Inc., did not exist in August 2021 when the CCA was signed, and therefore, Atkins, as a promoter of that unformed entity, may be held personally liable on the contract. Doc. 42, Pls.' Summ. J. Mot. Br., ¶ 33. Second, Impact claims that Atkins may be held personally liable under the Texas Tax Code as an officer of a business entity that lost is corporate privileges. Under § 171.225 of the Texas Tax Code, a director or officer of a corporation may be held personally liable for a corporation's debts "[i]f the corporate privileges are forfeited for the failure to file a report or pay a tax or penalty." *See* TEX. TAX CODE ANN. § 171.255.  According to Impact, Innovent Brands—the second entity listed as an applicant on the CCA—lost its corporate privileges in the state of Tennessee. *Id*. ¶ 32. Impact argues that Atkins was an officer of Innovent Brands, and therefore, he is personally liable under § 171.225 of the Texas Tax Code. *Id*.

Material issues of fact preclude summary judgment against Atkins on either ground. With respect to the claim for promoter liability, there is conflicting evidence regarding when Wild Card, Inc. came into existence. Wild Card, Inc. is the successor entity to Wild Card LLC, a limited liability company organized under the laws of Tennessee. Doc. 42-12, Ex. D, 5. Wild Card LLC was organized on January 1, 2021. *Id.* at 4–5. Wild Card LLC was eventually converted into a corporation—Wild Card, Inc.—on December 10, 2021. *Id.* at 6–7. Although Wild Card, Inc. was listed as an applicant on the CCA, Wild Card LLC had not yet converted into Wild Card, Inc. at the time the CCA was signed in August 2021. However, the Tennessee Secretary of State has certified that "Wild Card Inc., . . . was formed or qualified to do business in the State of Tennessee on 01/01/2021." *Id.* at 2. This certification directly contradicts Impact's position that Wild Card, Inc. did not exist in August 2021.[10] And if Wild Card, Inc.'s existence dates back to January 1, 2021, then it existed on August 5, 2021, when the CCA was signed, which in turn would mean that Atkins could not be held liable as a promoter of a "corporation which has not yet been formed." Accordingly, Impact is not entitled summary judgment against Atkins for promoter liability.

With respect to Impact's claim under the Texas Tax Code, Impact has not conclusively established that the "Innovent Brands" listed on the CCA lost its corporate privileges. *See* Doc. 42, Pls.' Summ. J. Mot. Br., ¶ 32. The CCA lists "Innovent Brands [d/b/a] Wild Card" as one of the entities contracting with Impact. Doc. 42-4, CCA, 2. Impact maintains that the Innovent Brands listed as an applicant on the CCA is Innovent Brands, LLC, a Wyoming limited liability company

---

[10] In fact, this would seem to suggest that, under Tennessee law, Wild Card, Inc.'s existence relates back to date Wild Card LLC was originally formed, considering that the date that the Tennessee Secretary of State certified Wild Card, Inc. was formed (January 1, 2021) is the same date Wild Card LLC was created.

that had its certificate of authority revoked by the state of Tennessee in August 2010. Doc. 42, Pls.' Summ. J. Mot. Br., ¶ 32; Doc 42-11, Ex. C, 2–6. However, Atkins raises a genuine issue of material fact through his testimony that the Innovent Brands listed on the CCA is in fact a separate limited liability company, Limited Gifts & Collectibles, LLC, d/b/a Innovent Brands. *See* Doc. 47-1, Defs.' App'x, 373–374. Although Impact has presented evidence that an entity named Innovent Brands, LLC lost its corporate privileges, Doc 42-11, Ex. C, 2–6, it has offered none that suggests that this is the same Innovent Brands as the one listed in the CCA or that the Innovent Brands listed on the CCA lost any privileges. And if the Innovent Brands listed on the CCA did not lose its corporate privileges, then any claim against Atkins for individual liability under the Texas Tax Code necessarily fails. Therefore, Impact is not entitled summary judgment against Atkins on this ground either.

In sum, the Court cannot grant summary judgment on Impact's claim for breach of contract against Atkins because there are genuine issues of material fact. Thus, Impact's motion for summary judgment on its contract claim against Atkins is **DENIED**.

The Court next turns to Impact's motion for summary judgment on Wild Card's claim against Impact's subsidiary, Graphic Converting Ltd. Wild Card claims that Graphic Converting Ltd. is a party to the contract and thus may be held liable for breach of contract and other related claims asserted by Wild Card (i.e., breach of implied and express warranties). Doc. 55, Defs.' Resp., 16–17. Impact argues that Graphic Converting Ltd. did not contract with Wild Card, perform services for Wild Card, or provide any goods to Wild Card. Doc. 42, Pls.' Summ. J. Mot. Br., ¶¶ 54–56. The Court agrees with Impact.

"When a contract is unambiguous, it is the responsibility of the court to ascertain and give effect to the intention of the parties, as expressed in the contract." *Frimeda U.S.A., Inc. v. Thinnes*, No. 05-92-00380-CV, 1992 WL 333422, at *2 (Tex. App.—Dallas Nov. 16, 1992, no writ); *see Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011). The starting point is the language of the contract itself. *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Courts will "presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Equistar Chemicals L.P.*, 2020 WL 4746469, at *7 (citations omitted).

Here, the language of the parties' contract clearly establishes that Graphic Converting Ltd. was not a party to the contract. The signed CCA explicitly states that "[t]his Confidential Credit Application is entered into by Impact Stamping . . . and Wild Card." *See* Doc. 47-1. Defs.' App'x, 22. Graphic Converting Ltd. is not mentioned anywhere in the CCA. *See id.* And while the quote that Parikh sent to Atkins appears on both Impact Stamping's and Graphic Converting Ltd.'s letterhead, *see* Doc. 42-2, Quote, courts have found that a business's name on a letterhead is insufficient to overcome express contractual language to the contrary. *See Frimeda U.S.A., Inc.*, 1992 WL 333422, at *2 ("The fact that the contract is typed on [defendant's] letterhead . . . does not alter the plain language of the first sentence nor evidence an intent that [defendant] was to be a party to the contract."). Interpreting the CCA according to clear and unequivocal language, the Court concludes that Graphic Converting Ltd. was not a party to the contract.

Wild Card argues that two pieces of evidence are sufficient to—at the very least—to show that Graphic Converting Ltd. was a party to the contract. Doc. 55, Defs.' Resp., 17. First, Wild

Card notes that Graphic's letterhead appears on a form sent to Wild Card's credit references, which was filled out after the CCA was signed. *Id.*; Doc. 47-1, Defs.' App'x, 24–27. Second, Wild Card points to an email sent by an individual named Shawn Petersen, which stated that "Graphic Converting/Impact will provide" certain materials. Doc. 55, Defs.' Resp., 16–17; Doc. 56-4, Ex. 3, 3. Petersen worked for one of Impact's subcontractors but was otherwise unaffiliated with either Graphic or Impact. *See* Doc. 47-1, Defs.' App'x, 726–30. In addition, the email was not sent to any Wild Card officers or employees. Doc. 56-4, Ex. 3. Finally, the email was also sent after the CCA was signed. *See id.*

Wild Card's evidence is insufficient to evidence an intent contrary the express language of the CCA. The evidence on which Wild Card relies amounts to two messages that were dated after the CCA was signed and that were neither sent nor received by Wild Card. Doc. 47-1, Defs.' App'x, 24–27; Doc. 56-4, Ex. 3. Such evidence is hardly probative of Wild Card's intent that Graphic Converting Ltd. be a party to the contract. *See Anglo-Dutch Petroleum Int'l, Inc.*, 352 S.W.3d 445, 451 ("[I]t is the parties' expressed intent that the court must determine."). But more importantly, neither piece of evidence demonstrates an intent to deviate from the express language of the CCA, which clearly states that "[t]his Confidential Credit Application is entered into by Impact Stamping . . . and Wild Card." *See* Doc. 47-1. Defs.' App'x, 22; *see Frimeda U.S.A., Inc.*, 1992 WL 333422, at *2 ("The language in a contract should be accorded its plain grammatical meaning unless the parties *definitely intended* otherwise." (emphasis added)). Accordingly, the Court concludes that, as a matter of law, Graphic Converting Ltd. was not a party to the contract at issue in this case. *See Equistar Chemicals L.P.*, 2020 WL 4746469, at *7 (explaining that interpretation

of unambiguous contract is a question of law for the court). Thus, Impact's motion for summary judgment on Wild Card's contract claim against Graphic Converting Ltd. is **GRANTED**.

Wild Card also asserts claims against Graphic Converting Ltd. for breach of the implied warranties of merchantability, fitness for a particular purpose, and good workmanship as well as a claim for breach of express warranty. See Doc. 55, Defs.' Resp., 1. However, none of these claims may proceed against a non-party to the contract. *See* TEX. BUS. & COM. CODE ANN. §§ 2.313–.315. Therefore, because Graphic Converting Ltd. was not a party to the contract, the Court also **GRANTS** Impact's motion for summary judgment on Wild Card's claims against Graphic Converting Ltd. for breach of the implied and express warranties.

### 3.   Affirmative Defenses

Both parties have also moved for summary judgment on Wild Card's affirmative defenses to Impact's claim for breach of contract. Wild Card asserts the following affirmative defenses to this claim: (1) lack of enforceable contract, (2) failure of conditions precedent, (3) prior material breach, (4) failure to state a claim, (5) equitable estoppel, (6) laches, (7) waiver, (8) unclean hands, (9) fraudulent inducement and misrepresentation, (10) rejection of goods, (11) duress, (12) frustration of purpose, and (13) failure to mitigate damages. Doc. 14, Answer & Countercl., 5, ¶¶ 1–17. The Court has already ruled on three of these "affirmative defenses"—lack of enforceable contract, failure of condition precedent, and rejection of goods—in the preceding sections. *See supra* Section III.B.1. Wild Card moves for summary judgment on two of its remaining ten affirmative defenses (i.e., those which the court has not ruled on)—prior material breach and equitable estoppel. Doc. 46., Defs.' Mot. Summ. J. Br., 6–10. On the other side, Impact has moved

for summary judgment on each of Wild Card's remaining ten affirmative defenses. Doc. 42, Pls.'
Mot. Summ. J. Br, ¶¶ 34–41.

At the outset, the Court notes that Wild Card has effectively abandoned seven remaining
affirmative defenses: (1) failure to state a claim, (2) laches, (3) waiver, (4) unclean hands, (5)
duress, (6) frustration of purpose, and (7) failure to mitigate. "If a party fails to assert a legal reason
why summary judgment should not be granted, that ground is waived and cannot be considered or
raised on appeal." *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (citations omitted). This
requires that a party "press and not merely intimate the argument . . . before the district court."
*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 340 (5th Cir. 2005) (citation omitted). "An
argument must be raised "to such a degree that the district court has an opportunity to rule on it."
*Id.* (citation omitted).

Here, Impact moved for summary judgment on all of Wild Card's affirmative defenses,
including: failure to state a claim, laches, waiver, unclean hands, duress, frustration of purpose, and
failure to mitigate. Doc. 42, Pls.' Mot. Summ. J. Br, ¶¶ 34–41. Impact's argument was that common
law affirmative defenses such as these are inapplicable in a contract action brought under the UCC.
*Id.* In response, Wild Card first states that the UCC does not displace the entirety of the common
law, citing to case law supporting this proposition. Doc. 55, Defs.' Resp., 5. Wild Card then
summarily concludes, "As a result, the Court should consider all the Wild Card Parties' affirmative
defenses." *Id.* at 6. Wild Card reaches this conclusion without any explanation, analysis, or
application of the of the legal principle it articulated, nor does Wild Card cite any authority to
support this claim with respect to these seven affirmative defenses. Under such circumstances, the
Court concludes that Wild Card failed to "assert a legal reason why summary judgment should not

be granted." *Keenan*, 290 F.3d at 262. At best, Wild Card "merely intimate[d]" an argument that these defenses were viable by simply concluding that all defenses are viable without any analysis. *See Keelan*, 407 F.3d at 340. As such, the Court considers them abandoned. *See Roberts v. Overby-Seawell Co.*, No. 3:15-CV-1217-L, 2018 WL 1457306, at *11 (N.D. Tex. Mar. 23, 2018) (Lindsay, J.). Consequently, Impact's motion for summary judgment is **GRANTED** as to the following affirmative defenses: failure to state a claim, laches, waiver, unclean hands, duress, frustration of purpose, and failure to mitigate.

However, Wild Card has not abandoned the remaining, unruled on affirmative defenses— (1) prior material breach, (2) equitable estoppel, and (3) fraudulent inducement and misrepresentation. With respect to prior material breach and equitable estoppel, Wild Card directs the Court to case law and argues that these affirmative defenses are viable in a breach of contract action governed by the UCC. Doc. 46, Defs.' Mot. Summ. J. Br., 5–6, 8, 10. And although Wild Card never argues that the affirmative defense of fraudulent inducement is viable under the UCC, it does argue that fraud as an independent claim is permissible. Doc. 55, Defs.' Resp., 5–6. As these defenses have not been abandoned, the Court proceeds to the parties' arguments applicable to them.

    *i.*  *Impact's motion*

Impact argues that it is entitled to summary judgment on the three remaining affirmative defenses for two reasons. First, Impact argues that Wild Card has presented no evidence support these defenses. Second, Impact claims that these defenses are not viable in an action governed by the UCC. Doc. 62, Pls.' Reply, ¶ 10–11.

Impact's no evidence point must be denied because Impact has failed to make the requisite showing required under the Federal Rules of Civil Procedure. Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. If summary judgment is sought on this basis, the movant "must make some showing that evidence on an essential point is wholly lacking." *Bank of Am., N.A. v. Fulcrum Enterprises, LLC*, 20 F. Supp. 3d 594, 602 (S.D. Tex. 2014) (citation omitted). Here, Impact fails to even list the elements of Wild Card's remaining affirmative defenses, let alone identify those elements which lack evidentiary support. Impact has, therefore, failed to demonstrate that there is a lack of evidence to support "an essential point" with respect to these affirmative defenses. *See id.* Though Impact argues that Wild Card did not come forward with evidence in response to Impact's no evidence argument, Doc. 62, Pls.' Reply, ¶ 10–11, the burden never shifted to Wild Card to do so because Impact did not meet its initial burden of demonstrating an absence of evidence on an essential point. *See Celotex Corp.*, 477 U.S. at 322. Accordingly, Impact is not entitled to summary judgment on this ground.

Impact next asserts that it is entitled to summary judgment on Wild Card's remaining affirmative defenses because these defenses are barred by the UCC. Doc. 42, Pls.' Mot. Summ. J. Br., 34. As explained above, "common-law principles complement the UCC to the extent they do not conflict with the UCC and supplement its provisions unless displaced by particular provisions of the UCC." *Prosper Fla., Inc.*, 649 S.W.3d at 677. And, as relevant here, "[w]hen . . . the UCC is silent on an issue, the UCC itself mandates that courts supplement its provisions with common-law principles." *Id.* Accordingly, the issue presented by Impact's summary-judgment motion is

whether Wild Card's remaining affirmative defenses conflict with—and therefore are displaced by—the UCC or whether the UCC is silent on the issue such that the affirmative defenses are applicable in this case.

The Court concludes that the only affirmative defense asserted by Wild Card that is barred by the UCC is prior material breach. Under the UCC, a buyer is required to pay for the goods he accepts; thus, even when the seller has otherwise breached, a buyer must nevertheless pay if the buyer accepts goods. *See Omni USA, Inc.*, 964 F. Supp. 2d at 840–41; TEX. BUS. & COM. CODE ANN. § 2.607. Here, Wild Card attempts to use prior material breach in order to avoid paying for goods its accepted. Doc. 46, Defs.' Mot. Summ. J. Br., 10; *see also Man Indus. (India), Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). To allow Wild Card to use prior material breach in this manner would be in direct conflict with the provision of the UCC that states, "The buyer *must* pay at the contract rate for any goods accepted." TEX. BUS. & COM. CODE ANN. § 2.607 (emphasis added). Because Wild Card intends to use prior material breach in direct contravention of the plain language of the UCC, the Court concludes that prior material breach is not a viable defense in this case. *See* TEX. BUS. & COM. CODE ANN. § 6.07; *Prosper Fla., Inc.*, 649 S.W.3d at 677. The Court therefore **GRANTS** Impact's summary judgment motion on Wild Card's affirmative defense of prior material breach.

However, it appears that equitable estoppel and fraudulent inducement are viable affirmative defenses under the UCC. While this Court has not found a case directly on point, other courts have entertained fraudulent inducement and equitable estoppel as affirmative defenses in UCC cases. *See, e.g., Graybar Elec. Co. v. LEM & Assocs.*, L.L.C., 252 S.W.3d 536, 546 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Supply Pro, Inc. v. Ecosorb Int'l, Inc.*, No. 01-15-00621-

CV, 2016 WL 4543136, at *7 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, pet. denied); *J.D. Fields & Co.*, 426 F. App'x at 281; *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 135 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd). It would appear, therefore, that these affirmative defenses are viable; Impact cites no caselaw or provision of the UCC which suggests otherwise.  In addition, these defenses implicate a party's assent to the terms of a contract in that both defenses require a false statement intended to induce another to enter into a contract. *See Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 289 (5th Cir. 2002); *Cook Composites*, 15 S.W.3d at 135.  And contracts for the sale of goods governed by the UCC—like all contracts—require mutual assent. *See, e.g., Avialae S De RL De CV v. Cummins Inc.*, 472 F. Supp. 3d 340, 347 (W.D. Tex. 2020). In light of the nature of these defenses and the absence of any authority to the contrary, the Court **DENIES** Impact's motion for summary judgment on the affirmative defenses of fraudulent inducement and equitable estoppel.

        *ii.*    *Wild Card's motion*

Of the two remaining affirmative defenses, Wild Card only seeks summary judgment on one—equitable estoppel. Doc. 46, Defs.' Mot. Summ. J. Br., 10. However, genuine issues of material fact preclude summary judgment on the equitable estoppel defense.

A party asserting the affirmative defense of equitable estoppel must prove five elements: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Internacional Realty, Inc. v. 2005 RP W., Ltd.*, 449 S.W.3d 512, 529 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Here, Wild Card premises its equitable estoppel defense on Impact's representation that it was experienced in making trading cards. Doc. 46, Defs.' Mot. Summ. J. Br., 10. According to Wild Card, Impact falsely represented its experience by claiming that it was related to "Graphic Converting Packaging, a known leader in the trading card space" and by stating it had "produced trading cards for Topps, Panini, and Upper Deck." Doc. 47-1, Defs.' App'x, 1003–04; *see* Doc. 46, Defs.' Mot. Summ J. Br., 10. Wild Card's CEO, Atkins, stated in his sworn declaration that "[h]ad I known that Mr. Parikh had no experience in producing trading cards, I would never have hired him and Impact Stamping to produce over eight million cards." Doc. 47-1, Defs.' App'x, 1004. However, Impact has presented evidence tending to show that Impact never represented that it possessed experience in producing trading cards. Specifically, Impact points to Parikh's affidavit, which provides that "at no time did I ever represent that I, Impact or Graphic has experience in printing sports trading cards." Doc. 42-1, Parikh Aff., ¶ 4.

The competing sworn statements create a genuine issue of material fact as to the first element of the equitable estoppel defense. That is, there is conflicting evidence regarding whether Impact ever represented that it was experienced in producing trading cards. Thus, Wild Card's motion for summary judgment as to this defense is **DENIED**.

## C.   *Breach of Implied Warranties*

The Court next turns to Wild Card's claims for breach of the implied warranties. *See* Doc. 42, Pls.' Mot. Summ. J. Br., ¶¶ 34–41; Doc. 46, Defs.' Mot. Summ. J. Br., 12–14. Wild Card asserts claims against Impact for breach of the implied warranty of (1) merchantability, (2) fitness for a particular purpose, and (3) good workmanship.  Doc. 14, Answer & Countercl., 13–17. Wild Card only moves for summary judgment on its claims for breach of the implied warranties of

merchantability and fitness for a particular purpose. Doc. 46, Defs.' Mot. Summ. J. Br., 12–14. Impact moves for summary judgment on all three of Wild Card's counterclaims. *See* Doc. 42, Pls.' Mot. Summ. J. Br., ¶¶ 34–41.

At the outset, the Court notes that Wild Card may only maintain its breach of implied warranty claims on the goods it accepted. When a seller tenders nonconforming goods, a buyer may recover for either breach of contract or breach of warranty. *See Advon Corp.*, 517 F. Supp. 3d at 664. These causes of action, however, have been described as mutually exclusive. *See Structural Metals, Inc. v. S & C Elec. Co.*, No. SA-09-CV-984-XR, 2012 WL 5208543, at *5 (W.D. Tex. Oct. 22, 2012) (citing *A.O. Smith Corp. v. Elbi S.p.A.*, 123 F. App'x 617, 619 (5th Cir. 2005)). Which cause of action a buyer may pursue depends on whether the buyer accepts or rejects nonconforming goods.[11] *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991). A buyer may only recover for breach of implied warranty if he finally accepts the goods. *Advon Corp.*, 517 F. Supp. 3d at 664. On the other hand, a buyer may only recover for breach of contract with respect to goods he rejects or when he otherwise revokes his acceptance. *Cf. Structural Metals, Inc.*, 2012 WL 5208543, at *5. Applying this principle here, to the extent Wild Card's claims for breach of implied warranties are premised on the 460,000 defective cards returned to Impact, these claims fail as a matter of law. *See id.*; *Advon Corp.*, 517 F. Supp. 3d at 664. Instead, Wild Card's claims for breach of the implied warranties must stem from some defect in the cards that it finally accepted. *See Structural Metals, Inc.*, 2012 WL 5208543, at *5.

---

[11] There is an exception to this general rule which allows a party to maintain a breach of contract claim with respect to nonconforming goods that are accepted. This exception only applies "where the alleged non-conformity relates to the specific obligations of the seller under the terms of the contractual agreement." *Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*, 938 F.3d 661, 667 n.4 (5th Cir. 2019) (quotes omitted). However, this exception is inapplicable here because Wild Card fails to "point to [a] contractual provision establishing [Impact's] specific obligation" to deliver proper cards. *Id.*

Having clarified the permissible scope of Wild Card's claims for breach of implied warranties, the Court proceeds to the parties' summary-judgment arguments.

1.      Impact's Motion

Impact first argues that it is entitled to summary judgment because Wild Card's counterclaims for breach of the implied warranties of merchantability, fitness for a particular purpose, and good workmanship are barred by the UCC. Doc. 42, Pls.' Mot. Summ. J. Br., ¶¶ 34–41. Specifically, Impact contends that "Defendants' claims of alleged defects in the goods delivered and accepted cannot serve as grounds in support of Defendants' counterclaims . . . as a matter of law." *Id.* ¶ 41. Impact is incorrect. The only condition on a buyer's recovery under the UCC with respect to accepted goods is that the buyer provide the seller with reasonable notice of any nonconformity. Tex. Bus. & Com. Code Ann. § 2.607(c)(1). Here, there is evidence that Wild Card notified Impact of the nonconformities in the accepted goods, as Atkins's sworn declaration indicates that he informed Impact of the defects as soon as the defects were discovered. Doc. 47-1, Defs.' App'x, 1004. Accordingly, Impact is not entitled to summary judgment on the ground that the UCC prohibits Wild Card from pursuing its claims for breach of the implied warranties with respect to goods accepted.

Impact also claims that it is entitled to summary judgment on these claims because Wild Card has not presented sufficient evidence of damages. Doc. 42, Pls.' Mot. Summ. J. Br., ¶ 3. After reviewing the record evidence, the Court concludes that there is some evidence of damage to Wild Card, even though the amount of damage may be in dispute.[12] Wild Card has offered evidence that

---

[12] As discussed above, Impact has moved to exclude much of Wild Card's evidence of damages, but Impact concedes that excluding damages would not defeat Wild Card's recovery on its claims. Doc. 43, Mot. Thus, the Court leaves for a separate Order the issue of the admissibility of the damages evidence.

tends to show that a portion of the cards delivered and accepted were of a lesser value than what was implicitly warranted. *See* Doc. 47-1, Defs.' App'x, 597–611. Because there is evidence Impact delivered cards that were of lesser value than what was warranted, Wild Card has presented evidence of damages sufficient to survive summary judgment. *See* TEX. BUS. & COM. CODE ANN. § 2.714(b). Therefore, Impact's motion for summary judgment on these claims is **DENIED**.

    2.    <u>Wild Card's Motion</u>

The Court next turns to Wild Card's motion for summary judgment on its claims for breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.

Wild Card is not entitled to summary judgment on its claim for breach of the implied warranty of merchantability because it has not argued that Impact is a merchant with respect to trading cards. A claim for breach of the implied warranty of merchantability may only be pursued against a seller who is a merchant with respect to the goods of the kind sold. *See* TEX. BUS. & COM. CODE ANN. § 2.314(a). Wild Card fails to even argue that Impact is a merchant with respect to trading cards, let alone prove that that Impact is a merchant as a matter of law. *See* Doc. 46, Defs.' Mot. Summ. J. Br., 12. While Impact may well be a merchant of trading cards, Wild Card was required to make that argument and point to record evidence in support thereof. *See Fontenot*, 780 F.2d at 1194. Having failed to do so, Wild Card's motion summary judgment on this counterclaim is **DENIED**.

Wild Card likewise is not entitled to summary judgment on its claim for breach of the implied warranty of fitness for a particular purpose. A claim for breach of the implied warranty of fitness for a particular purpose "arises if the seller has reason to know of a particular purpose for

which the goods are acquired and that the buyer is relying on the seller's skill or expertise in selecting the goods." *Sipes v. Gen. Motors Corp.*, 946 S.W.2d 143, 158 (Tex. App.—Texarkana 1997, writ denied). "A 'particular purpose' is a specific use by the buyer that is peculiar to the nature of the buyer's business, and differs from an ordinary purpose, which is the purpose envisaged in the concept of merchantability and goes to the uses that are customarily made of the goods." *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 896 F. Supp. 2d 582, 607 (S.D. Tex. 2012).

Here, Wild Card has not established that the trading cards produced by Impact were intended to be used any differently than how trading cards are ordinarily used. Wild Card only argues that the cards it sought from Impact were for a particular purpose because these cards "required a specific quality level." Doc. 44, Defs.' Mot. Summ. J. Br., 13. But the high-quality nature of goods does not necessarily implicate the buyer's intended use of those goods. For example, a buyer may ask for high-quality shoes for the particular purpose of climbing mountains; however, a buyer may ask for the same high-quality shoe for the normal purpose of walking on ordinary ground. *Cf. Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 365 (Tex. App.—Corpus Christi-Edinburg 1994, no writ). Whereas the former might give rise to a claim for breach of the warranty of fitness for a particular purpose, the latter would not. *See id.* Accordingly, that Wild Card asked for high-quality cards is insufficient to prove its counterclaim as a matter of law. And because Wild Card has not otherwise pointed to evidence demonstrating that the cards it asked Impact produce were meant to be used differently from their ordinary use, Wild Card is not entitled to summary judgment on its claim for breach of the implied warranty of fitness for a particular purpose. *See Coppock v. Nat'l Seating & Mobility, Inc.*, 121 F. Supp. 3d 661, 670 (W.D. Tex. 2015). Thus, Wild Card's motion for summary judgment on this claim is **DENIED.**

D.    *Breach of Express Warranty*

Both parties move for summary judgment on Wild Card's counterclaim for breach of express warranty. Doc. 42, Pls., Mot. Summ. J. Br., ¶¶ 42–42; Doc. 46, Defs.' Mot. Summ. J. Br., 14. Impact claims that there is no evidence to support an element of this claim; Wild Card argues it has proven its claim as a matter of law. Doc. 42, Pls., Mot. Summ. J. Br., ¶¶ 42–42; Doc. 46, Defs.' Mot. Summ. J. Br., 14.  The Court agrees with Impact.

An obvious prerequisite to a party's ability to bring a breach of express warranty claim is the existence of an express warranty. *See* TEX. BUS. & COM. CODE ANN. § 2.313. Under the UCC, there are three ways to create an express warranty: (1) the seller makes an affirmation of fact or a promise that "relates to the goods" (2) the seller describes the goods or (3) the seller samples or models the goods. *Id.* § 2.313(a)(1)–(3). Here, there is no evidence that Impact either described the cards to Wild Card or provided samples of the cards. Wild Card must therefore identify an affirmation of fact or a promise made by Impact which relates to the cards. *See id.*

Here, Wild Card has not presented sufficient evidence to create a fact issue regarding the existence of an express warranty. Wild Card argues that Impact's statement "you will be working with guys who make cards for topps, panini, and upper deck" created an express warranty that the cards would meet particular standards, and this warranty was breached when Impact failed to deliver cards meeting those standards. Doc. 46, Defs.' Mot. Summ. J. Br., 14. Wild Card in essence argues that Impact *implicitly* created an *express* warranty that the cards would be of a particular quality by stating that experienced individuals would work on the production of the cards; there is no express affirmation that the cards would be of a particular quality. *See id.* That is, the statement itself only relates to the manufacturers of the cards, not the cards themselves. *See* TEX. BUS. &

COM. CODE ANN. § 2.313(a)(1) (express warranties must "relate[] to the goods"). Because this is the only statement that Wild Card claims created an express warranty, Wild Card's breach of express warranty claim fails as a matter of law because it has failed to demonstrate the existence of an express warranty. Accordingly, Impact motion for judgment on this claim is **GRANTED**.

E.    *Fraud*

Lastly, Wild Card moves for summary judgment on its counterclaim against Parikh for fraud. Doc. 46, Defs.' Mot. Summ. J. Br., 14–15. Wild Card argues that Parikh fraudulently misled Wild Card into believing that Impact had experience in printing trading cards. *Id.* Wild Card relies on evidence that Parikh allegedly misled Wild Card into thinking that Third-Party Defendant Graphic Converting Ltd. was the same as company as Graphic Converting Packaging, "a known leader in the trading card space." Doc. 47-1, Defs.' App'x, 1003.  Parikh allegedly did this by "refer[ing] to his company as GC." *Id.*  Wild Card also claims that, in an attempt to induce Wild Card to contract with Impact, Parikh fraudulently claimed that Wild Card would "be working with guys who make cards for topps, panini, and upper deck." *Id.* at 15.

The Court concludes that Wild Card is not entitled to summary judgment on its fraud claim because Wild Card has not presented evidence showing a requisite element of the claim: that the representation was false. *See Las Palmas Med. Ctr. v. Moore*, 349 S.W.3d 57, 67 (Tex. App.—El Paso 2010, pet. denied). First, Parikh's reference to his company as "GC" is not a false representation as these are the actual initials of Parikh's company, Graphic Converting Ltd. Doc. 47-1, Defs.' App'x, 1004. Second, Wild Card has not established as a matter of law the falsity of Parikh's statement "you will be working with guys who make cards for topps, panini, and upper deck." *See id.* at 15.  Impact has introduced evidence which reveals that, at the time this message

-44-

was sent, Impact was working with Randy McClure, a printer who had in fact worked with these companies. Doc. 42-1, Parikh, Aff., ¶ 4. McClure was apparently introduced to Wild Card before this message was sent. *Id.* Thus, there is evidence that Parikh's statement was "literally true." *See Blanton v. Sherman Compress Co.,* 256 S.W.2d 884, 887 (Tex. Civ.—Dallas 1953, no writ). And while "a representation [that is] literally true is actionable if used to create an impression substantially false," *Id.*, Wild Card has not made such at showing at this stage. Therefore, Wild Card's motion for summary judgment on its fraud claim against Parikh is **DENIED**.

## IV.

## CONCLUSION

For the reasons stated above the court **GRANTS** in part and **DENIES** in part the relief requested. Impact's Motion for Summary Judgment (Doc. 41) is **GRANTED** as to the following:

- Impact Stamping's claim for breach of contract against Wild Card, Inc. solely on the issue of liability;

- Wild Card's claims against Graphic Converting Ltd. for (1) breach of contract, (2) breach of the implied warranty of merchantability, (3) breach of the implied warranty fitness for a particular purpose, (4) breach of the implied warranty of good workmanship, and (5) breach of express warranty;

- The following affirmative defenses asserted by Wild Card to Impact Stamping's breach of contract claim: (1) lack of enforceable contract, (2) failure of conditions precedent, (3) prior material breach, (4) failure to state a claim, (5) laches, (6) waiver, (7) unclean hands, (8) duress, (9) frustration of purpose, (10) rejection of nonconforming goods, and (11) failure to mitigate damages; and

- Wild Card's claim for breach of express warranty against Impact Stamping.

Impact's Motion for Summary Judgment (Doc. 41) is **DENIED** as to the following:

- Impact Stamping's claim for breach of contract against Wild Card, Inc. solely on the issue of damages;

- Impact Stamping's claim for breach of contract against Daniel Atkins;

- The following affirmative defenses asserted by Wild Card to Impact Stamping's breach of contract claim: (1) equitable estoppel and (2) fraudulent inducement;

- Wild Card's claim for breach of contract asserted against Impact Stamping; and

- Wild Card's claims against Impact Stamping for (1) breach of the implied warranty of merchantability, (2) breach of the implied warranty fitness for a particular purpose, (3) breach of the implied warranty of good workmanship.

Wild Card's Motion for Summary Judgment (Doc. 45) is **GRANTED** as to the following:

- Impact Stamping's claim for suit on open account; and

- Wild Card's claim for breach of contract against Impact Stamping solely on the issue of liability.

Wild Card's Motion for Summary Judgment (Doc. 45) is **DENIED** as to the following:

- Impact Stamping's claim for breach of contract asserted against Wild Card, Inc.;

- Wild Card's claim for breach of contract against Impact Stamping solely on the issue of damages;

- The following affirmative defenses asserted by Wild Card to Impact Stamping's breach of contract claim: (1) failure of condition precedent, (2) rejection of nonconforming goods, (3) prior material breach and (4) estoppel; and

- Wild Card's Claims for (1) breach of implied warranty of merchantability, (2) breach of implied warranty of fitness for a particular purpose, (3) breach of express warranty, and (4) fraud.

Finally, the Court **DEFERS** ruling on Wild Card's Motion for Summary Judgment on Impact Stamping's claim for attorneys' fees until the Court rules on the pending Motion for Leave to Amend.

All relief not herein granted is **DENIED**.

      **SO ORDERED.**

      **SIGNED: January 29, 2024.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE